Nathaniel Kelly, Esq., SBN 262016
LAW OFFICES OF NATE KELLY
388 Market Street, Suite 1300
San Franscisco, CA 94111
Telephone:  (415) 336-3001
Email:     esquire@natekelly.com

Attorneys for Plaintiff BORIS GALITSKY

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORIS GALITSKY, an individual<br><br>PLAINTIFF,<br><br>v.<br><br>ELASTICA, INC; BLUE COAT, INC.; AND DOES 1-10,<br><br>DEFENDANTS.<br><br>Defendants. | Civil Action No.  5:16-cv-2383<br><br>**COMPLAINT FOR:**<br><br>**1) BREACH OF CONTRACT;**<br>**2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; AND**<br>**3) UNFAIR COMPETITION**<br><br>**and**<br><br>**DEMAND FOR JURY TRIAL** |

-1-

**COMPLAINT**

### NATURE AND SUMMARY OF THE ACTION

1. This is an action brought by PLAINTIFF BORIS GALITSKY ("Plaintiff"), seeking compensatory and statutory damages against ELASTICA INC. ("Elastica") and BLUE COAT INC. ("Blue Coat"), and Does 1-10 (Collectively "Defendants") in connection with DEFENDANTS' breach of contract. BLUE COAT and ELASTICA should be considered the same for the purposes of this action as the two companies have merged with both entities remaining ongoing concerns and are jointly and severally liable for this particular liability . PLAINTIFF and DEFENDANTS together are referred to herein as ("THE PARTIES").

2. DEFENDANT'S wrongful acts include, without limitation, breach of contract, breach of implied covenant of good faith and fair dealing, and violation of California's Unfair Competition Law.

### JURISDICTION AND VENUE

3. PLAINTIFFS bring their Complaint under Federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are diverse in citizenship and the amount in controversy exceeds $75,000.

4. Venue is proper in this Court pursuant to 28 U.S.C. because a substantial part of the events and omissions giving rise to the claims herein occurred, and a substantial part of the property that is the subject of this action is situated, in this District. Among other things, Defendants undertook their actions, knowing, and with the intention that, they would damage PLAINITFF in this District.

### THE PARTIES

5. Plaintiff Boris Galitsky is an individual currently residing, and during relevant times in this action, at 7 Gorchakova #155, Moscow, Russia.

6. Defendant ELASTICA, INC. is a Delaware Corporation registered to do business and with its principle place of business in San Jose, CA 95128.

7. Defendant BLUE COAT SYSTEMS, INC. is a Delaware Corporation registered to do business and with its principle place of business in Sunnyvale, CA 94085.

## FACTUAL BACKGROUND

8. Plaintiff signed an Employment Contract with and began working for Elastica on February 13, 2014. See, Exhibit A: Elastica, Inc. At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement.

9. Part of Plaintiff's compensation came in the form of a Stock Option Agreement, which is governed by defendant Elastica's Equity Incentive Plan (the "Plan"), granted on March 9, 2014. See, Exhibit B: Elastica, Inc. 2012 Equity Incentive Plan; and also, Exhibit C: Elastica, Inc. 2012 Stock Option Agreement.

10. The Stock Option Agreement had a stated vesting commencement date of February 13, 2014, Plaintiff's first date of employment. Under the terms of the Stock Option Agreement, the vesting schedule for the stock options was 25% of the 50,000 total shares granted on the one year anniversary of the Vesting Commencement Date, and 1/48 of the shares subject to the Option would vest each month thereafter, for for each month he remained a "Service Provider."

11. The Plan defines a "Service Provider" as an Employee, Director or Consultant.

12. In May of 2015, Elastica and DOES (its agents) instructed Plaintiff that they wanted to reclassify him as a consultant and that he would need to sign additional paperwork.  And, on May 18, 2015, Plaintiff entered into a "Consulting Agreement" with Elastica. See, Exhibit D: Elastica Consulting Agreement.

13. No mentions by Defendants to Plaintiff were made in regards to differences in stock option vesting under the new classification, or were any statements made the Plaintiff at the time of his new contract regarding the clock starting on his options expiration date.

14. Although Plaintiff was now called a consultant, no material changes in his work were anticipated or occurred. And Defendants were aware that Plaintiff was not properly classified as an independent contractor when they switched his classification.

15. Nothing changed on the technical nature of his work when he switched to consulting.  He worked with the same team, the same software algorithm, and used the same system.  The only

difference is that he used a different Elastica email account, and billed differently. There were no differences in the job activities at all.  During the times Defendants considered him an employee, and as a consultant, Plaintiff worked 9-5 from Moscow for the majority of the contracts.

16. Plaintiff worked under this "Consulting Contract" for Elastica from May 18, 2015 until November 17th 2015 (the full term of his contract), meaning he was a Service Provider for a total of 21 months.[1]

17. Under the terms of the Equity Incentive Plan, the stock options under the plan would be exercisable for three (3) months after the Participant ceases to be a Service Provider."

18. On November 9, 2015, Elastica was acquired by Blue Coat. Plaintiff is informed and believes Blue Coat paid $7.15 a share.

19. Blue Coat did not renew Plaintiff's contract before it ended on November 18, 2015.

20. Over a period of several weeks commencing on December 13, 2015, Plaintiff contacted representatives of DEFENDANTS via email inquiring about his rights to exercise his stock options under the Equity Incentive Plan.

21. In response to his inquiries, Defendants stated that Plaintiff's employment ended on May 19th, 2015, and he would have had three months from that date to exercise his options. They contend that Plaintiff's vesting terminated because the "consulting agreement did not provide for vesting as part of the compensation and included [a boilerplate Entire Agreement clause]." See, Exhibit E: Emails between Boris Galitsky and Kevin Thompson.

22. Defendants stated that since Plaintiff did not exercise the options by August, his options were cancelled.

23. Defendants' interpretation of their contractual and legal obligations to Plaintiff, especially their reliance on an irrelevant and boilerplate clause, are incorrect and unreasonable.

---

1. Plaintiff worked at Elastica between Feb 2014-May 2015 (15 months) as an employee, at which point he switched to a consultant through November 17; for a total of 21 months of services provided.

24. In fact, the Employment Contract is merely establishing the "rules" of Plaintiff's employment, not his compensation.

25. Given that Plaintiff's Employment Contract makes absolutely no mention of the specific terms of Plaintiff's compensation or the Equity Incentive Contract, stock options clearly were not a part of the standard compensation and employment/contractor agreements provided by Elastica, but were indeed expected to be and were addressed in other contractual agreements.

26. This is further evidenced by the fact that the Stock Option Agreement has a similar "Entire Agreement" clause, which surely was not intended to and did not invalidate the "confidentiality" or "[invention] ownership" provisions of Plaintiff's Employment Contract.

27. And, moreover, the Plan is explicit that "Consultants" are "Service Providers" for purpose of vesting; and "Consultants" are any person rendering services to the company (Elastica).

28. Furthermore, section 13(c) of the Plan, <u>Merger or Change of Control</u>, clearly states that the Administrator of the Plan was responsible for deciding how to process outstanding options (payout, immediate vest with option to buy, or convert) and informing Plaintiff of this choice in time for him to act.

29. This was not done and, thus, Defendants have violated their contractual obligations to Plaintiff.

30. Clearly, based on Defendants email correspondence with Plaintiff, the Plan Administrator incorrectly determined that persons, such as Plaintiff, who converted from full time employees to contractors or consultants no longer had stock options that were vesting.

**FIRST CLAIM FOR RELIEF**
**For Contract Breach**
**(Against all DEFENDANTS)**

31. Plaintiff and Elastica entered into a valid, written Equity Incentive Plan on March 9, 2014. The agreement was supported by fair and reasonable consideration by both sides. Elastica provided Plaintiff with valuable stock options to incentivize Plaintiff to work at Elastica, and in exchange, Plaintiff did so.

//

32. Under the terms of the Equity Incentive Plan, the Option under the agreement was exercisable for three (3) months after Plaintiff ceases to be a Service Provider. A Service Provider is defined in the Incentive Plan as an Employee, Director or Consultant.

33. Thus, although Plaintiff's status changed from being a full-time, at-will employee with the company to being a consultant on March 18, 2015, Plaintiff was still a Service Provider and the terms of the Equity Incentive Plan remained in full-effect for 90 days after the termination of consulting agreement, which terminated on November 17, 2015. There was no gap in employment between when Plaintiff was an at-will employee and when he was a consultant.

34. Plaintiff fully performed his duties under the Equity Incentive Plan, by continuing to work for Elastica from the date he signed the Stock Agreement on March 9, 2014, until the termination of his employment on November 17, 2015.

35. Plaintiff sought to exercise his stock Options pursuant to the Stock Agreement within three months of the termination of his employment as a consultant on November 17, 2015. To that end, he contacted Defendants requesting more information regarding how to exercise his Options pursuant to the agreement. At that time and continuing till today, Plaintiff had the ability and intent to tender the full purchase price of his vested option. Plaintiff is not aware of the exact tender amount required because he is not aware of how the Plan Administrator chose to deal with vested options acquired during the merger.

36. By informing Defendant that he had no longer had any stock Options to exercise, and that his Options had been canceled, Defendant breached the Stock Agreement. But for the Defendants' breach of the agreement, Plaintiff would have exercised his rights under the agreement and has been damaged by the loss in value therein.

- If the Plan Admin chose to buyout all vested options, Plaintiff is owed $152,031, which comes from first determining his total vested shares [21/48 x 50,000] = 21,875 and multiplying by $6.95 ($7.15 (sale price) minus $0.20 (option price)).

-6-

COMPLAINT

- If the Plan Admin chose to fully vest all options with the opportunity to buy, Plaintiff should have been given the opportunity to pay $10,000 in exchange for the 50,000 shares - the cash value of this opportunity being $347,500, which comes from multiplying the total shares offered, 50,000, by the difference between the share price at sale/merge and the option prices ($7.15 (sale price) minus $0.20 (option price)).

**SECOND CLAIM FOR RELIEF**
**For Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against all DEFENDANTS)**

37. Plaintiff incorporates by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

38. Plaintiff and Elastica entered into a valid employee agreement and Stock Option Agreement. Pursuant to contractual agreements, Elastica was obligated to provide Plaintiff with stock options that he would be able to exercise for three months after he ceased being a Service Provider.

39. Plaintiff fully performed under these agreements and continued did not cease being a Service Provider as defined in the Plan. Accordingly, the three-month window for exercising his stock options was not triggered when the nature of his employment changed from an at-will employee to a consultant.

40. Even if the Court were to find that the change in nature of the employment relationship did in fact trigger the three-month window for exercising stop options, this change was a mere pretext to confuse Plaintiff and cheat him out of his ability to exercise his stock options, and is a blatant breach of the implied covenant of good faith and fair dealing between the Parties.

41. As a result of the employment relationship that existed between Plaintiff and Elastica, the aforementioned Employment Contract, Stock Option Agreement, and the Equity Incentive Plan, the expressed and implied promises made in connection with that relationship and those agreements, and the acts, conduct and communications resulting in these implied promises, Defendants promised to act in good faith toward and deal fairly with Plaintiff. In each of the

contracts between Plaintiff and Elastica, there is therefore an implied covenant by each party that it will do nothing to deprive the other parties of the benefit of their rights under these contracts.

42. Nevertheless, in direct opposition to these implied Covenants, Elastica unfairly interfered with Plaintiff's right to receive compensation and benefits due to him under the Stock Option Agreement by inducing him into changing the nature of the employment relationship merely to trigger the three-month window to exercise stock options.

43. There was absolutely no difference in the nature of the work or the hours of work that Plaintiff performed for Elastica from when he was an at-will employee to when he was a consultant. Elastica knew that Plaintiff would fail to exercise the stock options because he would believe that his continued status as a Service Provider would mean that the three-month window for exercising stocks had not yet been triggered. At no point did Elastica inform Plaintiff that the change in his employment status triggered the three-month window for exercising his stock options. These clearly constituted unfair dealings.

44. In fact, Elastica unfairly induced Plaintiff to change his employment status in order for him to lose his stock options in part because of the success that the company was achieving at the time, mere months before it was acquired (in no small part due to Plaintiff's services), and the stock options would have become even more valuable. Indeed, Defendant's actions were a mere pretext to cheat Plaintiff out of a contract benefit to which he was already clearly entitled, such as compensation already earned.

45. As a direct result of Elastica's actions, Plaintiff has suffered direct and consequential damages, including substantial lost employment compensation and benefits, which is the amount he would have made if allowed to exercise his stock options.

### THIRD CLAIM FOR RELIEF
**Violation of California Unfair Competition Law – Cal. Bus. & Prof. Code § 17200 - 17209**
**(Against all DEFENDANTS)**

46. Plaintiff realleges and reincorporates all allegations contained in paragraphs 1-33 as if

fully set out herein.

47. Plaintiff asserts that Defendants have engaged in unfair and fraudulent business practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200-09 (UCL).

48. The UCL prohibits "unfair, unlawful and fraudulent" conduct in connection with business activity.

49. "Unfair competition" is defined in the UCL as any one of the following "wrongs":[1] (1) an "unlawful" business act or practice; (2) an "unfair" business act or practice; (3) a "fraudulent" business act or practice; (4) "unfair, deceptive, untrue or misleading advertising"; and (5) any act prohibited by sections 17500 through 17577.5. These definitions are disjunctive.[2] Each of the "wrongs" operates independently from the others. "[I]n other words, a practice is prohibited as 'unfair' or ['fraudulent'] even if not 'unlawful' and vice versa."[3]

50. The Legislatures apparent intent in passing the UCL was to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur."[4]

51. Defendants perpetrated a business practice whereby they would change the employment status of at-will employees, even where, as here, the change was a misclassification, for the purpose of avoiding compensation due to these employees in the form of vested stock options.

52. Defendants were aware that they were likely to be acquired in the near future, which in turn would cause immediate vesting for key employees whom they offered Equity Incentive Plans to.

53. Defendants were aware that Plaintiff was not properly classified as an independent contractor when they switched his classification: Nothing changed on the technical nature of his

---

[1] The full text of section 17200 reads as follows: As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with 17500) of Part 3 of Division 7 of the Business and Professions Code.
[2] See State Farm Fire & Cas. Co. v. Super. Ct., 45 Cal. App. 4th 1093, 1102 (1996); see also Lepton Labs, LLC v. Walker, No. 2:14-CV-04836-ODW, 2014 WL 4826164, at *8 (C.D. Cal. Sept. 23, 2014) (holding that complaint need not specify which prong a UCL claim is brought under).
[3] Id.
[4] Comm. on Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197, 210 (1983). See, also Fletcher v. Sec. Pac. Nat'l Bank, 23 Cal. 3d 442, 449 (1979).

work when he switched to consulting. He worked with the same team, the same software algorithm, the same system. The only difference is that he used a different Elastica email account, and billed differently. No differences in the job activities at all. During both his employment and consultant period, Plaintiff worked 9-5 from Moscow for the majority of the contracts.

54. Defendants (although incorrectly, as detailed above) believed that by switching Plaintiff from an employee to an independent contractor, his stock options would stop vesting.

55. Defendants also believed that Plaintiff, and others like him, would be unaware that their change in status would have any effect on his stock options, which were provided under another contract.

56. Defendants further believed and so intended, that because of this lack of information and awareness, that Plaintiff and those like him were unlikely to "properly" exercise his shares prior to their "termination" and or sale of the Company.

57. Plaintiff was not informed at any time during his switch to consulting that his stock options would no longer vest and or must be purchased within three months and had no reason to believe his options were no longer vesting.

58. According to Defendants' interpretation of the contracts at issue, Plaintiff did indeed not exercise his stock options before they expired and has been thus damages.

**Wherefore, Plaintiff seeks**:

1) Compensatory damages in the amount of $347,500 plus statutory interest at 10% since the date of breach;
2) Attorneys fees under Unfair Competition Law;
3) Any other damages allowed by law or contract, as the Court deems proper.

//
//
//

Respectfully Submitted,

April 27, 2016                              **LAW OFFICES OF NATE KELLY**

                                            By: *Nate Kelly*
                                            _____
                                            Nathaniel G. Kelly

                                            Law Offices of Nate Kelly
                                            388 Market Street, Suite 1300
                                            San Francisco, CA 94111
                                            (415) 336-3001
                                            Esquire@natekelly.com

                                            Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:   April 27, 2016                     **LAW OFFICES OF NATE KELLY**

                                            By: *Nate Kelly*
                                            _____
                                            Nathaniel G. Kelly

                                            Law Offices of Nate Kelly
                                            388 Market Street, Suite 1300
                                            San Francisco, CA 94111
                                            (415) 336-3001
                                            Esquire@natekelly.com

                                            Attorneys for Plaintiffs

**COMPLAINT**